## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF CONNECTICUT
### HARTFORD DIVISION

| | | | |
|---|---|---|---|
| IN RE: | ) | CASE NO. | 13-51144 (JJT) |
| | ) | | |
| LXENG LLC, | ) | CHAPTER | 7 |
| DEBTOR. | ) | | |
| | ) | | |
| RICHARD M. COAN, TRUSTEE OF | ) | ADV. PRO. NO. | 15-05027 (JJT) |
| LXENG LLC, | ) | | |
| PLAINTIFF | ) | RE: ECF NOS. | 4, 40, 153, 155, 156, |
| | ) | | 157 |
| V. | ) | | |
| | ) | | |
| XIN CHEN, | ) | | |
| DEFENDANT. | ) | | |
| | ) | | |

## POST-TRIAL MEMORANDUM OF DECISION

### APPEARANCES

Brian K. Condon, Esq.                    Attorneys for Xin Chen
Laura M. Catina, Esq.
Condon & Associates, PLLC
55 Old Turnpike Road, Suite 502
Nanuet, NY 10954

Timothy D. Miltenberger, Esq.            Attorney for Richard M. Coan, Chapter 7
Coan Lewendon Gulliver & Miltenberger    Trustee
495 Orange Street
New Haven, CT 06511

I.    INTRODUCTION

This is an action to turn over nearly $1.6 million in alleged fraudulent transfers that a debtor

company made to an insider within two years of its bankruptcy filing. This Chapter 7 debtor,

LXEng LLC ("Debtor"), has had a common owner throughout its complicated history, Jie Xiao

(hereinafter, "Dr. Xiao"). Dr. Xiao and Michael Little ("Mr. Little") formed the Debtor in 2007,

as 50% co-owners, to sell technology packages that provided customers with engineering designs

for trichlorosilane ("TCS") manufacturing (solar panel technology). After Mr. Little died in late 2007, Dr. Xiao became the 90% owner and made Xin Chen ('hereinafter, "Ms. Chen") a 10% owner. At the time, Dr. Xiao and Ms. Chen were married, but they subsequently divorced in 2013, mere weeks before the Debtor filed its Chapter 7 bankruptcy petition (ECF No. 1, Case No. 13-51144)[1] on July 23, 2013. Dr. Xiao and Ms. Chen were married for roughly 21 years, and since 2007, the Debtor made seven significant financial transfers to Ms. Chen, totaling over $2.5 million. These transfers included: (1) $212,500.00 in 2007; (2) $140,000.00 in 2008; (3) $350,000.00 in September 2008; (4) $42,500.00 in August 2010; (5) $1,430,254.00 in June 2011; (6) $158,917.00 in July 2011; and (7) $180,157.00 sometime in 2012.

Richard M. Coan ("Chapter 7 Trustee"), filed the subject First Amended Complaint ("Complaint," ECF No. 4), alleging that all seven transfers were fraudulent transfers pursuant to 11 U.S.C. §§ 544, 548, and 550. In his four-count Complaint, the Chapter 7 Trustee seeks: (1) avoidance of the four-year transfers under 11 U.S.C. § 544(b)(1) and Conn. Gen. Stat. § 52-552a *et seq.*; (2) avoidance of the 2011 and 2012 transfers pursuant to 11 U.S.C. § 548; (3) recovery of both the four-year and two-year transfers from Ms. Chen pursuant to 11 U.S.C. § 550(a); and (4) imposition of a constructive trust over and against all fraudulently transferred assets to Ms. Chen, including the proceeds of those assets. In Ms. Chen's Answer ("Answer," ECF No. 40), she denied the Complaint's allegations and asserted six affirmative defenses: (1) lack of personal jurisdiction; (2) failure to state a claim for relief; (3) good faith; (4) that the transfer(s) were not for an antecedent debt or within the period prescribed under 11 U.S.C. § 547(b); (5) that the payment(s)

---

[1] Documents will be referred to throughout the opinion by their ECF numbers. The present Adversary Proceeding was partially consolidated for trial with *Chorches v. Chen* (Adv. Pro. No. 14-05019 (JJT)) and *Dow Corning Corp. v. Xiao* (Adv. Pro. No. 14-05054 (JJT)) in the underlying Chapter 7 case of *In re Xiao* (Case No. 13-51186 (JJT)). If items are docketed in a corresponding case, the case or adversary proceeding number will be listed next to the ECF number. If none so appears, then the item was docketed in the present Adversary Proceeding, Adv. Pro. No. 15-05027.

were for debt(s) incurred in the Debtor's ordinary course of business; and (6) that the transfer(s) were for a contemporaneous exchange for new value to the Debtor and, accordingly, were not avoidable.

The trial lasted ten days and six witnesses testified, including Dr. Xiao, Ms. Chen, and the Chapter 7 Trustee. During the course of the trial, Ms. Chen withdrew her first, second, fourth, fifth, and sixth affirmative defenses, so that only her alleged "good faith" defense remained. *See* ECF Nos. 96, 109. After trial, in the Reply Post-Trial Brief (ECF No. 156), the Chapter 7 Trustee contends that he only seeks to avoid the two transfers that occurred in 2011, two years before the Chapter 7 bankruptcy filing—for respectively $1,430,254.00 ("$1.43 Million Transfer") and $158,917.00 ("$158,917.00 Transfer") (collectively, "Transfers").

For the reasons delineated below, the Court enters judgment in favor of the Chapter 7 Trustee on all Counts, except Count VI of the Complaint.

II.    BACKGROUND AND PROCEDURAL HISTORY

The Debtor, Dr. Xiao, and Ms. Chen have an extensive history of lawsuits in both state and federal courts, spanning everywhere from the Eastern District of Michigan[2], to the New Jersey Family Court[3], to this Court. Their historied presence in courtrooms in cases that materially affect this bankruptcy litigation began over ten years ago; those proceedings, indicative of a sustained pattern of irregular and suspect transfers by the Debtor and Dr. Xiao, are hereinafter summarized chronologically, along with the facts material to the fraudulent transfer claims herein.

On January 16, 2009, Kathy Little ("Mrs. Little") filed a civil complaint against the Debtor and Dr. Xiao in the United States District Court for the District of New Jersey ("Little Action").[4]

---

[2] *Dow Corning Corp. v. Xiao*, Civil Action No. 1:11-cv-10008-TLL-CEB (E.D. Mich.).
[3] *See Chen v. Xiao*, Docket No. FM-14-1522-13, Superior Court of New Jersey, Chancery Division, Family Part of Morris County.
[4] *Little v. Xiao*, Civil Action No. 2:09-cv-00260-PGS-ES (D.N.J.).

Mrs. Little sought to recover the value of her deceased husband's 50% ownership interest in the Debtor pursuant to a "Termination Put" option set forth in the Debtor's operating agreement. The parties reached a settlement agreement in April 2012,[5] whereunder the Debtor and Dr. Xiao agreed to pay Mrs. Little $1.5 million—an obligation that they have yet to fulfill.

On December 1, 2009, Dr. Xiao and LXE Solar Inc. ("LSI") filed a complaint against the Republic of Seychelles, among others, in the United States District Court for the Southern District of New York ("Seychelles Action") to recover over $8.5 million that the country froze in Dr. Xiao's offshore bank account for alleged illegal activity.[6] The complaint alleged 26 counts, including, *inter alia*: violations of the Alien Tort Claims Act and Federal Computer Fraud and Abuse Act; theft and conversion; unjust enrichment; common law fraud; tortious interference; breach of fiduciary duty; conspiracy; aiding and abetting intentional tortious conduct; and misappropriation of trade secrets. Three weeks later, Dr. Xiao and LSI voluntarily dismissed the case, pursuant to Fed. R. Civ. P 41(a)(1)(A)(i), before any party had filed responsive papers.

On January 3, 2011, Dow Corning Corporation and Hemlock Semiconductor Corporation (collectively, "Dow") commenced an action against the Debtor, LSI, and Dr. Xiao in the United States District Court for the Eastern District of Michigan ("Dow Action") for misappropriation and use of trade secrets, trademark infringement, false advertising, false representations, unfair competition, trademark dilution, and tortious interference with contract.[7] Dow was principally concerned with the Debtor's appropriation of intellectual property allegedly stolen by Mr. Little and used in the Debtor's business for its benefit and profit.

---

[5] The date of the Mediation Settlement Agreement was left blank and states "April ____, 2012."
[6] The Seychelles Action is *Xiao v. Seychelles*, Civil Action No. 1:09-CV-09845-LTS (S.D.N.Y.).
[7] *See* note 2 of this Decision.

On June 12, 2013, Ms. Chen formally filed for divorce from Dr. Xiao ("Divorce Action") in the Superior Court of New Jersey ("Superior Court").[8] The Superior Court entered a Judgment of Divorce ("Divorce Judgment") on July 3, 2013. At the parties' urging, the Superior Court simultaneously approved a property settlement agreement ("PSA") along with the Divorce Judgment, transferring substantially all of the couple's liquid assets to Ms. Chen. Afterwards, Ms. Chen transferred substantial sums of money to her parents in China to allegedly fund their medical treatments for unspecified cancer conditions.

On July 23, 2013 ("Petition Date"), on the verge of a default judgment in the Dow Action, the Debtor filed this voluntary petition for bankruptcy protection under Chapter 7 of the United States Bankruptcy Code ("Bankruptcy Code") in the United States Bankruptcy Court for the District of Connecticut. The Chapter 7 Trustee was appointed shortly thereafter to represent the Debtor's Chapter 7 bankruptcy estate and protect the Debtor's unsecured creditors.

On October 23, 2013, the District Court in the Dow Action entered a default judgment against LSI, LXE Solar Ltd., and another defendant. On January 10, 2014, after Dow received relief from the automatic stay imposed by the Debtor's underlying Chapter 7 bankruptcy case, the District Court entered a default judgment against the Debtor, enjoining it from using or selling Dow's fluid bed reactor technology for the production of TCS and holding in abeyance Dow's request for disgorgement of $15.7 million, leaving only the case against Dr. Xiao pending.[9]

On April 28, 2015, the Chapter 7 Trustee initiated this Adversary Proceeding, pursuant to 11 U.S.C. §§ 544, 548, and 550, seeking: 1) to avoid the Debtor's transfers to Ms. Chen as fraudulent; and 2) to impose a constructive trust over the transferred property. The Chapter 7

---

[8] *See* note 3 of this Decision.
[9] The Dow Action is currently stayed and administratively closed due to Dr. Xiao's bankruptcy filing but may be reopened if Dow obtains relief from the automatic stay in Dr. Xiao's personal bankruptcy case to liquidate its claim.

Trustee filed the Complaint, as amended, on May 4, 2015 to broaden the scope of the transfers that he sought to avoid under Count I, to expand Count II's claims of insolvency due to the alleged avoidable transfers, and to correct scrivener's errors. On September 25, 2015, Ms. Chen filed her Answer with the aforesaid claimed affirmative defenses.

On August 25, 2017, following the trial, the Chapter 7 Trustee filed his Proposed Findings of Fact and Conclusions of Law (ECF No. 153), and Ms. Chen submitted her Post-Trial Brief (ECF No. 155), which contained her proposed findings of fact and conclusions of law.[10] On September 1, 2017, the Chapter 7 Trustee filed his Reply Post-Trial Brief, and Ms. Chen filed her Post-Trial Reply Brief (ECF No. 157).

## III.    JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1334(b) and may hear and determine this matter pursuant to the District Court's General Order of Reference dated September 21, 1984. The Chapter 7 Trustee asserts this Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(a), (b)(2)(A), and (b)(2)(H). This Court is the proper venue for this case pursuant to 28 U.S.C. § 1409. The parties have, in any event, afforded the Court consent to enter final judgment. *See* ECF Nos. 96, 153.

## IV.    FINDINGS OF FACT

The trial of this case spanned over ten days, including extensive witness testimony. The Chapter 7 Trustee testified on May 9, 2017; Ms. Chen testified on May 10 and 23, 2017; Jonathan Molloy testified on May 16, 2017 regarding the Dow Action; Dr. Xiao testified on May 17–19 and

---

[10] In her Post-Trial Brief, Ms. Chen requests that this Court take "judicial notice" of her Post-Trial Brief filed in *Chorches v. Chen* (ECF No. 268, Case No. 14-05019). Judicial notice is reserved for facts that are "not subject to reasonable dispute" because of general knowledge or because they are derived from an accurate and trustworthy source. Fed. R. Evid. 201(b). The request is improper, and to prevent the risk of muddying the records in the various cases involving Ms. Chen and creating an appealable issue, the Court will not take "judicial notice" of a purely adversarial brief or somehow incorporate it by reference in this Adversary Proceeding.

22, 2017; Lloyd J. Cazes, who prepared the Debtor's tax returns, testified as Ms. Chen's rebuttal witness on May 23, 2017; and Judge Thomas Zampino testified on May 24, 2017 as an expert witness on property settlement agreements under New Jersey domestic relations laws. According to Fed. R. Civ. P. 52, incorporated by Fed. R. Bankr. P. 7052, after considering the trial evidence and arguments, this Court makes the following Findings of Fact to supplement those advanced in the Introduction and Background and Procedural History of this Decision:

### The Officers' Marriage, Education, and Work History

1. Dr. Xiao and Ms. Chen married in 1992 and have two children together: a son born in 1996 and a daughter born in 1999. Tr. 6, 8, ECF No. 139.

2. Since 2000, Ms. Chen has lived with her children at 18 Parkview Road in Randolph, New Jersey ("Marital Home"). *Id.* at 7–8.

3. Dr. Xiao received his bachelor's degree from Shanghai Jiao Tong University and later his Ph.D. in analytical chemistry from the University of Michigan in 1996. *Id.* at 6; Tr. 5–6, 9, ECF No. 137. After graduation, he worked for Merck & Company, Inc. ("Merck") for four years as a scientist monitoring the quality of the pharmaceuticals Merck produced. Tr. 8–9, ECF No. 137.

4. Ms. Chen received her bachelor's degree from Shanghai Jiao Tong University in 1990 and her master's degree in analytical chemistry from the University of Michigan in 1996; she originally also pursued a Ph.D. at the University of Michigan but did not complete the program. Tr. 69–70, ECF No. 133, Tr. 3–6, ECF No. 139. After graduation, Ms. Chen worked as a chemist at Merck for four years and then worked at Novartis International AG ("Novartis") from 2000 through 2016 as a Scientist III and Investigator II. Tr. 4, ECF No. 133.

5. During Ms. Chen's employment at Novartis from 2010–2013, she earned roughly $100,000.00 annually. *Id.* at 4–5; Tr. 52, 66, ECF No. 124; Pl.'s Exs. H–J. According to their PSA, Dr. Xiao earned approximately $180,000.00 per year from his businesses. Tr. 101–02, ECF No. 133; Pl.'s Exs. J, VVV, at 6. However, according to Ms. Chen, her husband made anywhere from $1.43 million in 2010 to $275.00 in 2012. Tr. 103, ECF No. 133.

### The Debtor's Background

6. On July 19, 2007, Dr. Xiao and Mr. Little formed the Debtor under the laws of the State of Nevada to sell engineering services for TCS production.[11] Tr. 26–28, ECF No. 135; Pl.'s Ex. UUU. Originally, Dr. Xiao and Mr. Little each held a 50% ownership and membership interest in the Debtor and acted as its managers. Tr. 80, ECF. No. 136. The Debtor, an LLC, acted as a pass-through entity, distributing its income to its members. Tr. 10–11, ECF No. 134; *see also* Pl.'s Exs. H, I, J, LLL, and MMM.

7. In August 2007, the Debtor entered into a $6.3 million contract with a Chinese company, LDK, which was paid by early September 2007 into a Wells Fargo Bank, N.A. account. Tr. 28, ECF No. 135; Tr. 78–79, ECF No. 136. In September 2007, the Debtor entered into a contract worth more than $5 million with another Chinese company, KMYY. Tr. 28, ECF No. 120; Tr. 79, ECF No. 136. The Debtor never again entered into another contract. Tr. 98–99, ECF No. 134. In order to service and grow the Debtor's business, Dr. Xiao began

---

[11] TCS is a molecule used to produce solar silicon and polysilicon. Tr. 7, ECF No. 248. Solar silicon and polysilicon are highly refined, high purity silicon materials used to make items like computer chips and solar panel rays. *Id.* at 7–8, ECF No. 248, Adv. Pro. No. 14-05054. TCS is manufactured by taking silicon metal in lump form, grinding it into a fine powder, and then placing it into a fluidized bed reactor at high temperatures with some pressure. *Id.* From there, it is distilled, boiled, and purified further until it becomes a highly purified form of TCS. *Id.* It is reactive when exposed to water and very corrosive to skin and is, therefore, very hazardous. *Id.* at 19.

traveling extensively to China to pursue additional business opportunities. Tr. 6, 12–13, 90, ECF No. 133.

8. Mr. Little unexpectedly passed away in November 2007. Tr. 60, 81, ECF No. 121. Thereafter, Dr. Xiao increasingly traveled to Asia to secure new clients, to hire additional people, and "to rescue the company[.]" Tr. 50, 57–58, ECF No. 135; Tr. 84, ECF No. 136.

9. Before working for the Debtor, Mr. Little worked for Dow on its TCS technology. Tr. 9–10, ECF No. 135. In that capacity, Mr. Little had access to technical drawings, operating procedures, cost structures, and quality controls for Dow's TCS manufacturing. Tr. 18–19, ECF No. 248, Adv. Pro. No. 14-05054. Dr. Xiao had never before manufactured TCS. Tr. 77–78, ECF No. 139.

10. TCS manufacturing facilities are large and can cover several city blocks, as Dow's does. Tr. 9, ECF No. 248, Adv. Pro. No. 14-05054.

11. Dow spent several years and over $100 million developing its TCS technology. Tr. 9–10, ECF No. 248, Adv. Pro. No. 14-05054. Dow acts with abundant caution in protecting the confidentiality of its TCS technology and endeavors to keep its proprietary TCS technology safely guarded through, *inter alia*, confidentiality agreements, physical restrictions to its facilities, and restricted access. *Id.*

12. After Mr. Little's death, Dr. Xiao made Ms. Chen a 10% owner and member of the Debtor, which she remained until the Divorce Judgment entered on July 3, 2013. Tr. 43, 70–71, ECF No. 139. Throughout Ms. Chen's membership, Dr. Xiao retained the other 90% interest in the Debtor. Tr. 28, ECF No. 138. While serving as a member, Ms. Chen never attended a meeting of the Debtor's members. Tr. 20, ECF No. 133. She also never attended

any customer meetings or participated in any phone calls involving the Debtor or its customers. Tr. 78–79, ECF No. 139.

13. By April 2012, the Debtor no longer marketed its technology to prospective customers. Tr. 14–15, ECF No. 135. This was because Dr. Xiao wanted to be "associated with a new company" due to the Debtor's liabilities, including those owed to Mrs. Little and to Dow. *Id.*; Pl.'s Exs. PPP, at 9, TTT, at 5.

14. On August 29, 2013, Dr. Xiao testified at the Debtor's first creditors meeting that the Debtor did not enter into any new contracts because of the 2008 Great Recession. Tr. 18–19, ECF No. 135. However, at trial, Dr. Xiao also testified that the 2008 financial crisis was not the reason that the Debtor did not enter into new contracts. *Id.*

### The Dow Action

15. On March 27, 2008, Dow asked the Debtor to "ensure that its trade secrets or other intellectual property were not used or disclosed by Mr. Little without authorization" while undertaking the Debtor's business. Pl.'s Ex. A, at 1. Dow asked to review Mr. Little's computer. *Id.*; Tr. 15, ECF No. 248, Adv. Pro. No. 14-05054. The Debtor did not acquiesce and allow Dow access to the computer. Tr. 15–16, ECF No. 248, Adv. Pro. No. 14-05054.

16. In October 2008, the Debtor's counsel, Hofheimer Gartlir & Gross, LLP ("HGG"), the Debtor, and Dr. Xiao met with Dow's counsel because of Dow's growing concerns regarding the Debtor's use of its trade secrets and intellectual property. Tr. 44, ECF No. 135.

17. After the meeting, on the advice of legal counsel, the Debtor "loaned" Dr. Xiao $4.8 million on November 10, 2008, which was transferred into his personal account. *Id.* at 51–55; Pl.'s Ex. B-5. Dr. Xiao panicked, concerned that Dow could freeze the Debtor's bank accounts,

but he believed that Dow could not reach his personal bank accounts. Tr. 52–53, 55, ECF No. 135

18. In early 2010, Dow reviewed hard-copy documents mined from Mr. Little's computer at the FBI office in Washington, D.C. Tr. 11, ECF No. 248, Adv. Pro. No. 14-05054. During the summer of 2010, Dow viewed an image copy of Mr. Little's computer at an FBI office in Michigan. *Id.* at 15–16. Mr. Little's computer contained aerial photographs of Dow's TCS facilities with labels describing Dow's manufacturing process. *Id.* at 16. The computer also contained technical drawings of a fluid bed reactor similar to Dow's, as well as documents referencing the sale of technology to make TCS and discussing the breadth of Dow's knowledge regarding TCS technology. *Id.* at 16–18.

19. On January 3, 2011, Dow commenced the Dow Action against the Debtor and Dr. Xiao, amending its complaint ("First Amended Complaint") on June 12, 2013. Pl.'s Exs. T–U. Dow brought claims relating to misappropriating its technology under Michigan's Uniform Trade Secrets Act and sought an accounting of all profits and compensatory damages related thereto. Pl.'s Ex. U, at 30, 32. The First Amended Complaint also requested injunctions against the Debtor and its officers and sought punitive damages. *Id.* at 31–33. The damages sought included "any of the gains or profits that [the Debtor] and Dr. Xiao and the other entities had obtained through the use of Dow's intellectual property" and for the misappropriated and impermissible use of Dow's technology. Tr. 34, ECF No. 134.

20. Although Ms. Chen was not personally named in the Dow Action, she knew about the litigation and was repeatedly told by Dr. Xiao that there was "nothing to worry about because he hired a legal group already . . . and he did not do anything wrong." Tr. 95–96, ECF No. 133; Tr. 59, ECF No. 139.

21. On April 27, 2012, Dow deposed Dr. Xiao in the Dow Action. Tr. 11–12, ECF No. 135.

22. On March 13, 2013, the District Court rendered a decision and *Daubert* order partially granting Dow's motion to exclude the evidence of the Debtor's expert on Dow's claimed trade secrets because the evidence lacked reliability and did not meet the standards for admission under the Federal Rules of Evidence, dealing a striking blow to the Debtor's prospects for success in the litigation.[12] Pl.'s Ex. W. In the *Daubert* order, Dr. Hugo S. Caram, who was appointed by the District Court to serve as a neutral, independent expert under Fed. R. Evid. 706, confirmed that four of Dow's trade secrets were "not in the public domain, not ascertainable by proper means, and derive value from not being publicly known" and concluded that the defendants "used some of the identified trade secrets in their fluid bed reactor technology sold to third parties." *Id.* at 20–21. Dr. Caram concluded that Mr. Little provided the information to the defendants for their benefit. *Id.* at 22.

23. Shortly thereafter, on April 12, 2013, HGG moved to withdraw as Debtor's counsel for non-payment of legal fees, and the motion to withdraw was sent to Ms. Chen's Marital Home. Pl.'s Ex. QQQ. On April 26, 2013, three copies of the conditional order granting the motion to withdraw were sent to Ms. Chen's Marital Home. Pl.'s Ex. YYY, at 3.

24. On May 8, 2013, Attorney Luis Medina sent Judge Thomas L. Ludington, the U.S. District Judge presiding over the Dow Action, a letter on behalf of the Debtor, Dr. Xiao, and LSI, stating that the Debtor, Dr. Xiao, in his individual capacity, and LSI were in the process of retaining his firm "to prepare and file bankruptcy petitions for each." Pl.'s Ex. KKK, at 1. The letter stated that none of the defendants could afford to retain counsel. *Id.*

---

[12] In deciding a *Daubert* motion, federal judges must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993). In the Dow Action, the District Court found otherwise regarding the evidence of the Debtor's expert on three of Dow's claimed trade secrets and on the expert's legal conclusions on all 17 of Dow's claimed trade secrets.

25. On June 4, 2013, Ms. Chen received five copies of a Request for Clerk's Entry of Default at the Marital Home. Pl.'s Ex. ZZZ, at 8.

26. On June 7, 2013, Ms. Chen received at the Marital Home five copies of Plaintiff's Motion to File under Seal in addition to a Notice describing the Dow Action and reflecting the Debtor's intent to file for Chapter 7 bankruptcy protection. Pl.'s Exs. AAAA, at 17, CCCC, at 5.

27. On June 11, 2013, the District Court ordered a hearing on Dow's Motion for Default Judgment. Pl.'s Ex. FFFF, at 5. On June 12, 2013, Dow sent five copies of the Order Setting Hearing on Dow's Motion for Default Judgment by certified mail, with return receipt, to Ms. Chen's Marital Home. *Id.* at 1–2.

28. On June 18, 2013, Dow served the Summons and First Amended Complaint on Dr. Xiao by hand at the Marital Home. Pl.'s Exs. DDDD–EEEE.

29. On October 23, 2013, the District Court entered default judgment against LSI. Pl.'s Ex. OOO, at 24. On January 10, 2014, the District Court entered default judgment against the Debtor, enjoining it from using or selling Dow's fluid bed reactor technology to produce TCS. *Id.* As of this date, the District Court has not entered default judgment against Dr. Xiao due to the automatic stay relating to his pending bankruptcy petition. *See id.* at 23 (CM/ECF docket entry 207 notifies the parties that Dr. Xiao filed bankruptcy). The default judgments entered against the named defendants reserved decision on disgorgement of the claimed damages and other relief.

30. For over four years, between April 12, 2013 and June 18, 2017, motions, notice, and service were dispatched to Ms. Chen's Marital Home, which she continuously claimed to ignore at her peril. *See, e.g.*, Pl.'s Exs. QQQ, YYY–CCCC, FFFF.

31. On April 8, 2014, Dow's filed a proof of claim against the Debtor's bankruptcy estate that asserted $15.7 million in damages. Pl.'s Ex. G. While the Debtor allegedly disputes Dow's claim, it has neither filed nor prosecuted any such objection to Dow's claim. *See* Docket, Case No. 13-51144.

### The Little Action

32. On January 16, 2009, Mrs. Little sued Dr. Xiao and the Debtor in the Little Action for compensatory damages to recover the value of Mr. Little's membership interest, which she valued at $6,725,000.00. Pl.'s Ex. C, at 10. In doing so, she sought to enforce the Termination Put contained within the Debtor's operating agreement. *Id.* at 4–5. That provision required the Debtor to purchase Mr. Little's 50% interest in the Debtor upon his death. *Id.*

33. In 2011, Ms. Chen was deposed in the Little Action. Tr. 20–22, ECF No. 133. She was acutely aware at that time that Mrs. Little sought between $1–2 million from the Debtor and that it still owed Mrs. Little around $300,000.00. *Id.* at 22, 25.

34. In April 2012, the Debtor settled the Little Action with Mrs. Little for $1.5 million. Pl.'s Ex. NNN, at 5–6, 8. Shortly thereafter, in late April or May 2012, the Debtor paid Mrs. Little $1.1 million. Tr. 15, ECF No. 136. In 2013, the Debtor made an additional $100,000.00 payment to Mrs. Little, according to the settlement agreement terms. *Id.*; *see also* Pl.'s Ex. NNN, at 6. As of the Petition Date, the Debtor and Dr. Xiao still jointly owed Mrs. Little $300.000.00. Pl.'s Exs. F, at 15, NNN, at 1.

### The Offshore Dealings and the Formation of Other Entities

35. In July 2008, Dr. Xiao formed LSI in the Federation of St. Kitts and Nevis. Tr. 34–35, 65, ECF No. 135; Tr. 44–45, ECF No. 136; Pl.'s Ex. PPP, at 2. Dr. Xiao opened a bank account

("Seychelles Account") for LSI at Barclays Bank (Seychelles), Ltd. Pl.'s Ex. PPP, at 2. Only Dr. Xiao—not the Debtor—held an interest in LSI. *See* Pl.'s Exs. E–F.

36. LSI, solely owned by Dr. Xiao, entered into a $10 million TCS contract in August 2008 with Woongjin Polysilicon Co., Ltd. ("Woongjin"). Tr. 42, ECF No. 134; Tr. 65, ECF No. 135; Tr. 87–88, ECF No. 136. Even though the contract was not in the Debtor's name, the Debtor's employees performed all of the services for the contract. Tr. 15–17, ECF No. 135.

37. Woongjin paid more than $8.5 million to LSI's Seychelles Account under the contract. Pl.'s Ex. PPP, at 2. Sometime between December 5, 2008 and March 2009, the Financial Intelligence Unit, a Seychelles government agency, froze the Seychelles Account because the proceeds were derived from alleged criminal conduct. *Id.* at 3, 21.

38. In his complaint filed in the December 2009 Seychelles Action, Dr. Xiao stated that he formed LSI to enter into the Woongjin contract because the Debtor faced potential liabilities due to, *inter alia*, (1) "claims by third parties that Michael Little had possibly infringed their intellectual property rights," and (2) Mrs. Little's claims related to Mr. Little's interests in the Debtor. *Id.* at 9. In his mind, *and in his own words*, "the formation of [LSI] was a routine transaction of asset protection," meant to keep money offshore. *Id.* at 2; Tr. 37, ECF No. 135. Ms. Chen was fully aware of the reasoning behind LSI's formation. Tr. 78, ECF No. 133.

39. Seychelles unfroze the Seychelles Account at the end of 2009, and in early 2010, Dr. Xiao wired $6 million to a newly formed solely-owned, domestic company, LXE Solar, LLC ("LXE LLC"). Tr. 16, 19, 90, ECF No. 136. Dr. Xiao formed LXE LLC "to get [LXE LLC] money into the [United States]." Tr. 65, ECF No. 135. It also served as the new contracting party with customers because of the Debtor's legal woes. Pl.'s Ex. PPP, at 9.

40. At one point, HGG held $2.9 million as legal reserves from the money recovered in the Seychelles Action. Tr. 16–17, 90, ECF No. 136; Tr. 60, ECF No. 139.

41. Although the Debtor held a bank account in the United States, the Debtor's books did not account for the funds held by HGG and LXE LLC. Pl.'s Ex. D; Tr. 17, ECF No. 136.

42. Around December 31, 2012, LXE LLC paid Dr. Xiao $120,000.00 for his 2009–2012 salary. Tr. 68, ECF No. 135.

43. Dr. Xiao ceased operating LSI or LXE LLC as of the Petition Date. *Id.* at 62–63.

### The Suspicious Asset Transfers and Tax Returns

44. Dr. Xiao and Ms. Chen held a personal investment account as joint tenants with TD Ameritrade ("TD Account") since at least July 2011. Pl.'s Ex. D-1, at 10. The two parties held the TD Account jointly until the Divorce Judgment and PSA entered in July 2013. Tr. 49, ECF No. 133. The PSA granted Ms. Chen ownership of the entire TD Account. *Id.*

45. Although allegedly an officer and employee of the Debtor, Ms. Chen never entered into a written employment contract or consulting agreement with the Debtor. Tr. 13, ECF No. 133; Tr. 44, ECF No. 134. The Debtor never produced a Form W-2 or Form 1099 for Dr. Xiao or Ms. Chen. Tr. 45, ECF No. 134.

46. Ms. Chen testified that she assisted Dr. Xiao with the Debtor's business in 2007 after Mr. Little died. Tr. 25–26, ECF No. 139. Her work included retrieving the mail (which was directly delivered to the Marital Home), paying bills, filing, reviewing resumes, networking, and providing referrals. Tr. 15–18, ECF No. 133; Tr. 42–43, ECF No. 134; Tr. 45, ECF No. 139. She performed these administrative services for the Debtor after Mr. Little's death for an unknown amount of time. Tr. 13–14, ECF No. 133. She also claimed that she worked with a headhunter from 2007 to 2009 to locate candidates for employment

by the Debtor, even though she had no prior experience in human resources. Tr. 30–31, 45, 82–83, ECF No. 139. Like her husband, she had no experience in engineering or manufacturing TCS. *Id.* at 82. In 2007, she was compensated $212,000.00 by the Debtor for her work and responsibilities, even though she was neither party nor privy to any employment or consulting agreement with the Debtor. *Id.* at 75–77.

47. From 2007 to 2008, in the face of mounting business and frenzied legal pressures, Ms. Chen introduced her then-husband to her uncle Peiling Zhang, who allegedly was well-connected in the marketing field in China. *Id.* at 79–81; Tr. 113, ECF No. 133. Both Dr. Xiao and Ms. Chen intended to ensure that Chinese businesses continued to contract with the Debtor notwithstanding its legal troubles. Tr. 27, 34, 50–51, ECF No. 139. Ms. Chen testified that her consulting services and contacts "rescued the whole company." Tr. 28–30, ECF No. 139. The Debtor, however, never again entered into a contract with a single customer after 2007. *Id.* at 44. Despite her claims, Ms. Chen did not even know whether her uncle provided the Debtor with any business opportunities. *Id.* at 81; Tr. 113–14, ECF No. 133.

48. On September 10, 2008, around the time of Dr. Xiao's meeting with Dow, the Debtor transferred $350,000.00 as a purported "cash advancement" to Ms. Chen. Tr. 41, ECF No. 139; Pl.'s Ex. B-4. At trial, the Debtor characterized the money as a "shareholder distribution" of $150,000.00 and a pension contribution of $200,000.00. Tr. 46, ECF No. 139.

49. From 2009 to 2010, Ms. Chen entertained potential customers and their wives by taking them shopping, traveling, and to Broadway shows and dinner. *Id.* at 45–46, 52.

50. Ms. Chen remarkably does not recollect the amount of money she received from the Debtor in 2009 but testified that she did receive compensation at the end of the year. *Id.* at 46. She claims that she left the money in the Debtor to promote its continued growth. *Id.* at 46–47.

51. Ms. Chen received a total distribution of $1,058,907.00 by check from the Debtor in tax year 2010. *Id.* at 54–55. That year, Ms. Chen did take the money out of the Debtor. *Id.* On their 2010 joint tax return, Dr. Xiao and Ms. Chen reported dividend distributions of $1,589,171.00 from the Debtor. *Id.* at 35–36; Pl.'s Ex. H, at 1.

52. At the end of 2010, because of the business' distress and a deteriorating marriage, Ms. Chen told Dr. Xiao that she would no longer help him or the Debtor in their business endeavors. Tr. 61, 72–73, ECF No. 139. According to her testimony, between 2010 and 2011, Ms. Chen told Dr. Xiao that she also refused to answer the Debtor's phone any longer. *Id.* at 73. At the same time, despite a proliferation of mail and legal notices, she refused to open or process the cascade of mail related to the Debtor's business and legal troubles. Tr. 53–66, ECF No. 133.

53. In 2011, Dr. Xiao set up yet another company called Intelligent Solar, LLC ("Intelligent Solar") and made Ms. Chen its sole owner. Tr. 57, ECF No. 139. Together, they invested almost $700,000.00 in Intelligent Solar from their joint TD Account. *Id.* at 58. At the time of trial, Ms. Chen still owned Intelligent Solar, even four years after the Divorce Judgment entered. *Id.* at 73.

54. In July 2011, the Debtor wrote a check to Ms. Chen for the $158,917.00 Transfer, which was described on Ms. Chen's tax returns as a 2010 dividend from the Debtor. Pl.'s Ex. H, at 4; Tr. 49–50, ECF No. 133. The $158,917.00 Transfer from the Debtor was deposited into the TD Account on July 29, 2011. Pl.'s Ex. D-1, at 12; Tr. 50, ECF No. 133.

18

55. In the fall of 2011, Ms. Chen became ill and had surgery and told Dr. Xiao that she "cannot get involved much more than what [she] did before" with the Debtor. Tr. 14–15, ECF No. 133. She spent a week in the hospital and recovered at home, unable to eat for an additional week. *Id.* In 2011, despite her status as LLC member, Ms. Chen started "dumping" the Debtor's unopened mail into a box for her husband, Dr. Xiao, to "take care of when he gets home," consciously taking on a more passive role with the Debtor. Tr. 65, ECF No. 139. That year, Ms. Chen received a shareholder distribution of $18,015.00 from the Debtor, which she again left in the Debtor. *Id.* at 67; Pl.'s Ex. I, at 4. Dr. Xiao and Ms. Chen's joint 2011 tax return shows total distributions from the Debtor for $180,162.00. Pl.'s Ex. I, at 1.

56. On September 14, 2011, the Debtor deposited the $1.43 Million Transfer into the TD Account held jointly by Dr. Xiao and Ms. Chen. Pl.'s Ex. D-1, at 5; Tr. 44, ECF No. 134.

57. On their Calendar Year 2010 State of New Jersey tax return, the $1.43 Million Transfer was described as income to Dr. Xiao, with Ms. Chen receiving the $158,917.00 Transfer as income. Pl.'s Ex. H, at 18. Meanwhile, Dr. Xiao and Ms. Chen also characterized these transfers as dividends on their joint tax returns. *Id.* at 1.

58. On its 2011 federal income tax return, the Debtor reported cash assets of $166,022.00 at the end of the tax year. Pl.'s Ex. LLL, at 5. It also stated that its accounts receivable declined from $1.3 million at the beginning of the 2011 tax year to $0.00 at the end of the tax year. *Id.*

59. The only individual income listed on Ms. Chen's federal tax return for the years 2010 through 2012 was her approximately $100,000.00 salary from her Novartis employment, even though both spouses classified the $1.43 Million Transfer as a dividend payment. Pl.'s Exs. H–J; Tr. 5, ECF No. 133.

60. The Little Action was pending and active at the time of the $1.43 Million Transfer, but the lawsuit had been referred to arbitration. Pl.'s Ex. NNN, at 4.

61. After the $1.43 Million Transfer, the Debtor usually kept its bank account balance below $100,000.00 and only once had the balance over $180,000.00. Tr. 13, ECF No. 134. This lone occasion was in April 2012 when it received $1.1 million into its account from HGG and LXE LLC, which it quickly disbursed to fund a portion of Mrs. Little's settlement. *Id.* at 13–14, 48; Tr. 16, ECF No. 136; Pl.'s Ex. NNN, at 5.

62. By April 2012, the Debtor no longer marketed any products or services to the public, and Dr. Xiao badly wanted to associate himself with a new company both because of the Little Action and the possibility of Dow commencing litigation. Tr. 14–15, ECF No. 135; Pl.'s Exs. PPP, at 9, TTT, at 5.

63. In April 2012, the Debtor incurred a $1.5 million debt in order to settle the Little Action. Pl.'s Ex. NNN, at 5–6. To this day, there is still $300,000.00 outstanding to Mrs. Little due from the Debtor, Dr. Xiao, LSI, and LXE LLC jointly. *See* Pl.'s Exs. F, at 15, NNN, at 4–6.

64. On its 2012 federal income tax return, the Debtor reported negative cash assets and no accounts receivable. Pl.'s Ex. MMM, at 5. It also reported taxable income of -$634,713.00. *Id.* at 1.

65. The Debtor was patently insolvent by May 2013. Pl.'s Ex. KKK, at 1.

### The Officers' Divorce[13] and the Debtor's Chapter 7 Bankruptcy Filing

66. Ms. Chen filed the Divorce Action in New Jersey against Dr. Xiao on June 12, 2013. Tr. 37–38, ECF No. 133. The Divorce Judgment and PSA accordingly entered on July 3, 2013, without the benefit of any formal discovery. Pl.'s Ex. VVV, at 1, 5. The Superior Court intentionally did not pass on the PSA's merits. Pl.'s Ex. VVV, at 2–3.

67. Connected to the Divorce Action and approving the PSA, neither Ms. Chen nor Dr. Xiao, nor their respective counsel, disclosed the pending Dow Action or Little Action to the presiding judge in the Divorce Action. Tr. 71–72, ECF No. 133.

68. Dr. Xiao continued to reside at the Marital Home, both during and after the Divorce Action. *Id.* at 38.

69. Ms. Chen remained a member of the Debtor until her divorce was finalized on July 3, 2013. Tr. 71, ECF No. 139; Pl.'s Ex. VVV, at 19.

70. On July 3, 2013, Dr. Xiao transferred to Ms. Chen his right to the TD Account, which held $1,654,590.00 as of June 19, 2013. Pl.'s Ex. VVV, at 18. Pursuant to PSA § 28, Dr. Xiao transferred his one-half interest, worth approximately $827,295.00, in the TD Account to Ms. Chen "in lieu of alimony." *Id.* The TD Account funds were derived from the Debtor's distributions. *See supra* ¶¶ 54, 56; Tr. 101, ECF No. 133.

---

[13] In Ms. Chen's Post-Trial Brief, she asserts that the Chapter 7 Trustee made no reference to her and Dr. Xiao's divorce in the pleadings and, thus, the issues are not properly before the Court. The Chapter 7 Trustee did not bring a claim for relief based on the Divorce Action, so he is not required to plead such pursuant to Fed. R. Civ. P. 8(a). The Divorce Action is used as circumstantial evidence in support of the avoidance causes of action, which the Chapter 7 Trustee properly pled. Ms. Chen's counsel also complains about the Chapter 7 Trustee's questioning her during the trial about her Divorce Action, but the proper place to object to a particular line of questioning is during the witness' testimony rather than in any supplemental briefing. Her counsel, as noted by the transcript record, was noticeably silent during her testimony regarding the Divorce Action and what led to the couple's divorce. *See, e.g.,* Tr. 73, 79, 84, 87–91, 95, ECF No. 133; Tr. 61, 67–71, 94, ECF No. 139. In fact, her counsel stated on the record that he did not object to the Divorce Judgment entering into evidence. Tr. 99, ECF No. 133. To the extent Ms. Chen's attorney failed to object during her testimony to a particular question or line of questioning, he does not get a second bite at the apple here or on appeal to claim error, and the objection is deemed waived. Fed. R. Evid. 103(a).

21

71. Two years after the Divorce Judgment entered, Ms. Chen had not touched the monies in the TD Account to fund living expenses. Tr. 78–79, ECF No. 133.

72. On the advice of counsel,[14] Ms. Chen removed the money from the TD Account and placed it into four separate accounts because of a lawsuit Attorney Carlos Cuevas filed against her. *Id.* at 80, 82. Prior to doing so, her attorney, Brian Condon, asked the Court to lift its freeze so that she could move the money outside of her TD Account. *Id.* at 80–81. As she openly admitted in deposition testimony in July 2015, Ms. Chen subsequently moved the TD Account funds into four other bank accounts because Attorney Cuevas sued her for fraud and to recover legal fees incurred by the Debtor and her husband. *Id.* at 79–81. Under oath, Ms. Chen stated that because she was getting sued, "[t]hat's why everything has to be moved around." *Id.* at 80.

73. Prior to the Divorce Action, Dr. Xiao and Ms. Chen owned the unencumbered Marital Home as tenants by the entirety. Pl.'s Ex. VVV, at 17–18. Without the assistance of an appraisal, the couple valued the home at $500,000.00. *Id.* at 5, 17. Pursuant to PSA § 26, the Debtor transferred his one-half interest in the Marital Home to Ms. Chen. *Id.* at 18. Had Ms. Chen decided to sell the Marital Home after the Divorce Judgment entered, she was entitled to 100% of the sale proceeds. *Id.*

74. Dr. Xiao also relinquished his interest in the jointly owned bank accounts at Novartis Federal Credit Union ("NFCU"), which had the following approximate balances at the time of the PSA: $63,183.00 in the money market account, $2,217.00 in the shared draft

---

[14] During proceedings before this Court, both Ms. Chen and Brian Condon acknowledged that Attorney Condon, trial counsel in this case, advised Ms. Chen to move the money out of the TD Account. *See* Conn. Bar Ass'n, Informal Op. 91-22 (1991) (discussing the ethics violations of a lawyer who counsels or assists a client to engage in a fraudulent transfer with intent to deceive, delay, or burden creditors).

personal checking account, $18,760.00 in the 12-month shared certificate of deposit, and $8,190.00 in the 6-month shared certificate of deposit. *Id.*

75. PSA § 27 provided that Ms. Chen would transfer the NFCU jointly owned savings account with approximately $25,000.00 to Dr. Xiao. *Id.*

76. PSA § 29 provided that Ms. Chen would retain her interest in a Novartis 401(k) account with a balance on June 19, 2013 of $431,878.00 and a Merck 401(k) account with a balance of $36,289.00 as of June 19, 2013. *Id.* at 18–19.

77. Under PSA § 11, Dr. Xiao was obligated to pay $475.00 per week or $2,056.00 per month to Ms. Chen for child support. *Id.* at 12.

78. Pursuant to PSA § 29, Ms. Chen transferred her interest in the Debtor's pension plan, valued at $410,472.00, to Dr. Xiao. *Id.* at 19. Dr. Xiao retained his interest in a Merck 401(k) with a balance of $109,901.00 as of June 19, 2013, a Vanguard IRA (Schering-Plough) with a balance of $87,296.00 as of June 19, 2013, and a Great West Financial IRA with a balance of $69,000.00 as of June 19, 2013. *Id.*

79. Pursuant to PSA § 30, Dr. Xiao retained his interests in the Debtor; LXE Solar Systems, LLC; Ferrara PV, LLC; GTS PV, LLC; and Keystone Healthcare, LLC. *Id.* Ms. Chen retained her interest in Intelligent Solar. *Id.* at 19–20. No mention was made as to the fate of LSI or LXE LLC. *Id.* In preparing the PSA, neither party conducted any formal valuation on any of the businesses. *Id.* at 5. On August 7, 2013, Dr. Xiao no longer operated LXE LLC, LXE Solar Systems, LLC, or LSI. Tr. 62, ECF No. 135. In his individual bankruptcy schedules filed that same day, one month after the Divorce Judgment entered, Dr. Xiao valued his 100% ownership interests in the Debtor, LSI, LXE Solar Systems, LLC, Ferrara PV, LLC, and GTS PV LLC at $0.00, his 100% ownership interest in LXE LLC at

$3,203.35, and his 100% ownership interest in Keystone Healthcare, LLC at $1,400.00 respectively. Pl.'s Ex. F, at 6.

80. Under PSA § 31, Dr. Xiao kept a 2004 Honda Pilot, which he valued at $3,470.00 in his personal bankruptcy schedules. *Id.* at 8; Pl.'s Ex. VVV, at 20. Dr. Xiao gave the 2008 Lexus ES300, which he held in title, to Ms. Chen. Pl.'s Ex. VVV, at 20.

81. Under PSA § 32, Ms. Chen retained all of the Marital Home's personal property, including its furniture, appliances, and artwork. *Id.*

82. Despite Ms. Chen's claimed need for monies to support and educate her children, she sent the $1.43 Million Transfer to China to assure it was outside of the reach of creditors and this Court's jurisdiction. Tr. 39, ECF No. 134. This transfer to China occurred after Ronald Chorches ("Attorney Chorches"), the Chapter 7 Trustee in Dr. Xiao's bankruptcy proceeding, sued her in an adversary proceeding and after Attorney Cuevas sued her for fraud. Tr. 74–76, ECF No. 133; Tr. 39, ECF No. 134.

83. Ms. Chen's reasons for the transfers to her parents in China have varied, including to safeguard the money from the litigation initiated by Attorney Cuevas to collect his attorney's fees and to assist her parents with the expenses related to unspecified, grave medical conditions that they suffered. Tr. 39, ECF No. 134.

84. The Count finds her testimony regarding her parental motivations contrived, misleading, and not credible. The Court instead reasonably infers that the Debtor undertook all of these transfers for one purpose: to shield assets from the Debtor's mounting creditors and protect Ms. Chen from any claimants who might also pursue her.

85. On July 23, 2013, the Debtor filed for Chapter 7 bankruptcy protection in this Court. ECF No. 1, Case No. 13-51144. At that time, the Debtor had $993.66 in its Wells Fargo

24

Commercial Checking Account, no cash, no accounts receivable, and $978,000.00 in stated liabilities, exclusive of any liability owed to Dow. Pl.'s Exs. E, at 4, 7–8, RRR, at 1. The Debtor listed HGG as an unsecured creditor with a claim worth $666,000.00. Pl.'s Ex. E, at 12. The Debtor listed no real property in its schedules. *Id.* at 4.

86. The Debtor filed its Statement of Financial Affairs ("SOFA") signed by Dr. Xiao. *Id.* at 17. Question 10 on the SOFA requires itemization of "all other property, other than property transferred in the ordinary course of business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case." *Id.* at 20. The Debtor responded "None." *Id.* The Debtor, however, had deposited $1.43 million into Dr. Xiao's and Ms. Chen's TD Account on September 14, 2011, within the two-year period prior to the Petition Date. *Supra* ¶ 54. The Debtor also paid Mrs. Little $1.2 million in April or May 2012 and in 2013, in the two-year period before the Petition Date. *Supra* ¶ 33.

87. The Debtor's SOFA also indicated that the Debtor made no transfers of tangible personal property. Pl.'s Ex. E, at 20. However, in 2011, the Debtor vacated its laboratories and cleared the equipment to make the laboratories safer. Tr. 80, ECF No. 135. The Debtor also closed its Las Vegas laboratory and did not recover any assets. *Id.* at 83–84. Further, the Debtor disposed of all of its equipment in its Seattle laboratory. *Id.* at 86. The proceeds received from the sale of the Debtor's tangible property were allegedly deposited into the Debtor's cash accounts. *Id.* at 88–89. According to Dr. Xiao, the Debtor received the equivalent of "scrap metal" prices for these assets. *Id.* As depreciable assets, however, this equipment was allegedly worth $365,141.00, according to the Debtor's 2011 federal tax return. Pl.'s Ex. LLL, at 5.

88. The $1.43 Million Transfer remained in the TD Account, controlled by the only two members of the Debtor from the date of the $1.43 Million Transfer to the Divorce Judgment, which entered 20 days before the Petition Date. Pl.'s Exs. D-1, at 5, VVV, at 18.

89. On April 8, 2014, Dow filed a proof of claim for $15.7 million in the Debtor's bankruptcy action. Pl.'s Ex. G, at 1. Neither the Chapter 7 Trustee nor the Debtor ever filed an objection to Dow's proof of claim. *See* Docket, Case No. 13-51144.

90. On April 9, 2014, Mrs. Little and the Estate of Mr. Little filed a proof of claim for $300,000.00 in the Debtor's bankruptcy action. Exhibit NNN. Neither the Chapter 7 Trustee nor the Debtor ever filed an objection to their proof of claim. *See* Docket, Case No. 13-51144.

**The Officers' Lack of Credibility**

91. From their rigid and unresponsive demeanor, the pattern of ostensibly rehearsed and conclusory answers to probing questions, their palpable discomfort upon cross-examination, the general vagueness and evasiveness in their responses upon detailed cross-examination, their often confusing and contradictory replies, and after affording due weight to their unabashed, unapologetic, and continuous course of conduct to shelter assets and avoid creditors, this Court finds that Ms. Chen and Dr. Xiao lacked fundamental credibility and good faith as witnesses.

V.   CONCLUSIONS OF LAW

This case presents the Court with the age-old adage: if it looks like a duck, swims like a duck, and quacks like a duck, then it is probably a duck. This case makes it hard to ignore the repeated quacks in the room, leaving the Court to conclude there is a duck in its midst. Consistent

with that adage, this Court finds that the fraudulent conduct evaluated herein was manifest and palpable.

The Court ADJUDGES, DECREES, and DECLARES the following Conclusions of Law:

A.  Counts I and II: Avoidance Actions Under 11 U.S.C. § 544 and Conn. Gen. Stat. § 52-552A, *et seq.*

The Chapter 7  Trustee requests relief under 11 U.S.C. § 544, which provides relief under applicable state law. *See Daly v. Richardson (In re Carrozzella & Richardson)*, 302 B.R. 415, 419 (Bankr. D. Conn. 2003). Conn. Gen. Stat. § 52-522a, *et seq.* ("CUFTA") provides the statutory framework for transfer avoidance in Connecticut and is not materially distinct from 11 U.S.C. § 548, except for: (1) the extended four-year timeframe prescribed under Conn. Gen. Stat. § 52-552j; (2) the standing requirements as an actual pre-transfer creditor; and (3) the elements of Conn. Gen. Stat. § 52-552e must be proven by clear and convincing evidence. *Id.* at 419–20 (citing *Dietter v. Dietter,* 54 Conn. App. 481, 737 A.2d 926 (1999); *see also Epperson v. Entm't Express, Inc.*, 159 Fed. Appx. 249, 251–52 (2d Cir. 2005). The Chapter 7 Trustee claims that the Debtor made the Transfers to Ms. Chen for no consideration with actual intent to hinder, delay, or defraud its creditors at a time when it owed them millions of dollars and was insolvent.

To begin, based on the statute's plain language,[15] a trustee can seek transfer avoidance only if he enjoys the rights and status of an unsecured creditor holding a claim that arose prior to the date of the transfer(s) at issue. *O'Neil v. Jones (In re Jones)*, 403 B.R. 228, 233 (Bankr. D. Conn.

---

[15] *See* 11 U.S.C. § 544(b)(1) ("[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title[.]"); Conn. Gen. Stat. § 52-552e(a) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.").

2009). The $1.43 Million Transfer occurred in June 2011, while the $158,917.00 Transfer occurred in July 2011. Both Mrs. Little and Dow filed timely proofs of claim, to which the Debtor did not object. Their claims first arose in January 2009 and January 2011, respectively, well before the Transfers at issue. Since the Petition Date fell within the CUFTA statute of limitations period and the claims arose prior to the Transfers, either Dow or Mrs. Little rightfully could bring a CUFTA claim against the Debtor. Accordingly, the Chapter 7 Trustee possesses the requisite standing to avoid the Transfers under CUFTA.

A transfer may only be avoided under 11 U.S.C. § 544 or Connecticut law if, *inter alia*, the transferred funds constitute an asset or an interest in a debtor's asset. *See* 11 U.S.C. § 544(b)(1). To prevail on a fraudulent transfer claim, the Chapter 7 Trustee must prove the following elements: "(1) that the [d]ebtor made a transfer within the scope of CUFTA and (2) either (a) constructive fraud—that the transferor did not receive reasonably equivalent value and that, as a result, the transferor was unable to meet his obligations; or (b) actual fraud—that the transfer was made with actual fraudulent intent." *In re Jones*, 403 B.R. at 234. The Chapter 7 Trustee has met its burden on the first prong and need only prove a constructive or actual fraud by clear and convincing evidence. Because no material difference exists between the operative substantive law of both the state and federal standards, the Transfers can be analyzed conjunctively. *In re Carrozzella & Richardson*, 302 B.R. at 421.

To determine actual intent under Conn. Gen. Stat. § 52-552e(a)(1), courts may consider a number of factors, including whether:

> (1) The transfer or obligation was to an insider, (2) the debtor retained possession or control of the property transferred after the transfer, (3) the transfer or obligation was disclosed or concealed, (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit, (5) the transfer was of substantially all the debtor's assets, (6) the debtor absconded, (7) the debtor removed or concealed assets, (8) the value of the consideration received by the

28

debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred, (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred, (10) the transfer occurred shortly before or shortly after a substantial debt was incurred, and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Conn. Gen. Stat. § 52-552e(b).

For the Bankruptcy Code's purposes, a director, officer, person in control, general partner, or relative of any of the aforementioned persons are all insiders of a corporation. 11 U.S.C. § 101(31)(B); *U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 963 (2018). In the present scenario, Dr. Xiao, who acted as managing member and alter ego of the Debtor, is by every stretch of the definition an insider. Ms. Chen, as his wife of 21 years and 10% owner of the Debtor, was also indisputably an insider.

A highly educated man, Dr. Xiao was demonstrably aware of the potential liability that the Debtor faced because of the Little Action and Dow Action. Dr. Xiao formed LSI to divert funds from the Woongjin contract into Seychelles. Remarkably candid in his testimony, Dr. Xiao admits that his express intent and purpose behind forming LSI was to prevent Mrs. Little from receiving any of the Debtor's earnings. Only after Dow contacted the Debtor regarding Mr. Little's actions, and after Mrs. Little initiated the Little Action, did Dr. Xiao begin establishing other business entities in foreign countries and transferring millions of dollars from the Debtor to its insiders. As soon as Dr. Xiao learned that Dow was investigating the Debtor for its suspect business activities, Dr. Xiao defensively transferred money from the Debtor to his and Ms. Chen's personal bank accounts, including the TD Account, where both the $1.43 Million Transfer and $158,917.00 sat. The $1.43 Million Transfer to the TD Account was the single biggest transfer involving Ms. Chen.

Dr. Xiao, however, did not act alone. It is undisputed that Dr. Xiao and Ms. Chen held the TD Account jointly, where the $1.43 Million Transfer remained until the day of their Divorce

Judgment. At that point, Dr. Xiao transferred to Ms. Chen his one-half interest in the TD Account, making her its sole owner and giving her full control and use of its funds.

The purpose of the avoidance statutes is frustrated where, as here, the Debtor exercised dominion or control over the Transfer funds at issue to greatly diminish and annihilate the value of the Debtor's estate to frustrate a distribution to creditors, mainly Dow, Mrs. Little, and Attorney Cuevas. *See Daly v. Kennedy (In re Kennedy)*, 279 B.R. 455, 460 (Bankr. D. Conn. 2002).

Indeed, when Attorney Cuevas sued Ms. Chen, she took a page out of her husband's playbook and began transferring funds from the TD Account to several different bank accounts, both domestically and abroad. As she too admits, she did so purposefully to hide the funds from Attorney Cuevas and prevent him from collecting unpaid legal fees from the Debtor and her husband. Eventually, after being sued by Attorney Chorches, Ms. Chen conveniently removed the funds from the TD Account and transferred them to China. These combined actions and acknowledgments by the Debtor and its insiders prove actual fraudulent intent.

At the time of the Transfers, the Debtor was winding down its activities and closing its laboratories. It had not signed a new contract with any customer in almost four years. Throughout all of 2011, the Debtor was insolvent without sufficient assets to pay its lawyers or to settle or litigate the Dow Action or the Little Action, yet the Transfers were described as income distributions to Dr. Xiao and Ms. Chen. By the Petition Date, the District Court in the Dow Action had disqualified the Debtor's expert witness on several key issues with its *Daubert* order and approved HGG's withdrawal for failure to pay attorney's fees. The Debtor was undeniably insolvent and indisputably vulnerable to the legal consequences of these developments and received no reasonably equivalent value for the Transfers from Ms. Chen. The Chapter 7 Trustee has also met the burden of proof for constructive fraud.

From the overwhelming evidence presented, the Transfers by the Debtor to Ms. Chen fall under the scope of CUFTA. Accordingly, though a rigorous burden, the Chapter 7 Trustee demonstrated by clear and convincing evidence that the Transfers should be avoided under 11 U.S.C. § 544 and Conn. Gen. Stat. § 52-552a, as both Transfers were done to further actual and constructive fraud. The transferred funds were assets of the Debtor's Chapter 7 bankruptcy estate, and both Transfers to Ms. Chen are avoided under CUFTA and 11 U.S.C. § 544(b) as fraudulent transfers.

B.  Counts III: Actual Fraudulent Transfers Under 11 U.S.C. § 548

Under Count III, the Chapter 7 Trustee seeks to avoid the Transfers pursuant to 11 U.S.C. § 548(a)(1)(A). Much like CUFTA, the Bankruptcy Code provides a trustee with the power to avoid fraudulent transfers with actual intent:

> The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>> made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted[.]

11 U.S.C. § 548(a)(1)(A). To establish a prima facie case of an actual fraudulent conveyance, the trustee must establish actual fraudulent intent. *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC)*, 439 B.R. 284, 304–05 (S.D.N.Y. 2010). The debtor-transferor's intent is at issue in such claims, not the transferee's. *Id.* at 304. When making a claim for a fraudulent transfer, the trustee must prove each element by a preponderance of the evidence. *In re Carrozzella & Richardson*, 302 B.R. at 419. The purpose underlying the trustee's avoidance powers is namely to prevent asset depletion that otherwise would have been available to

31

creditors.[16] In examining the Transfers under the Bankruptcy Code's rubric, the Court adopts the facts, analysis, and reasoning in Part V. Section A., in addition to the Conclusions of Law below.

### i. The Significant Badges of Fraud

A debtor who "hinders or delays" has "an actual intent to significantly impair a creditor's collection efforts." *Cadle Co. v. Marra (In re Marra)*, 308 B.R. 628, 631 (D. Conn. 2004) (citations omitted). Because of the difficulty in proving actual intent to hinder, delay, or defraud in making its case, a party can rely on the "badges of fraud," which are "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *Sharp Int'l Corp. v. State St. Bank and Tr. Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (citation and internal quotation marks omitted). Since direct evidence of fraudulent intent is rare, "courts infer fraudulent intent by examining the circumstances surrounding the transfer to determine whether any 'badges of fraud' are present." *Hirsch v. Steinberg (In re Colonial Realty Co.)*, 226 B.R. 513, 522 (Bankr. D. Conn. 1998) (citing *Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1582 (2d Cir.1983)). Circumstantial evidence can be used to establish an intent to defraud. *United States v. Federowicz*, 2015 WL 1445092, at *3 (D. Conn. Mar. 30, 2015).

One badge of fraud can "spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud." *In re Colonial Realty Co.*, 226 B.R. at 522 (citing *Acequia v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 806 (9th Cir. 1994) (citation and internal quotation marks omitted)). Here, the Debtor and its sole two insider members initiated a material

---

[16] *See, e.g., Frontier Bank v. Brown (In re N. Merch., Inc.)*, 371 F.3d 1056, 1060 (9th Cir. 2004) ("11 U.S.C. § 548 seeks to prevent the debtor from depleting the resources available to creditors through gratuitous transfers of the debtor's property.") (citation and internal quotation marks omitted); *Official Comm. of Unsecured Creditors v. Sabine Oil & Gas Corp. (In re Sabine Oil & Gas Corp.)*, 562 B.R. 211, 225 (S.D.N.Y. 2016) ("In determining whether a conveyance is fraudulent, [t]he touchstone is the unjust diminution of the estate of the debtor that otherwise would be available to creditors.") (citation and internal quotation marks omitted).

and sustained cascade of fraudulent, evasive, and deceptive activities in the two years preceding the Petition Date.

Examples of "badges of fraud" include, *inter alia*: (1) concealing facts and false pretenses; (2) an unconscionable discrepancy in consideration received in exchange for the value of the property transferred; (3) creating a closely-held corporation for property receipt; (4) closeness in relationship between the parties; (5) retaining the property in question for benefit or use; (6) the financial condition of the transferor and transferee both before and after the transfer(s); (7) repeated patterns or the cumulative effect of courses of conduct post-insolvency or financial troubles; and (8) the timeline of events. *See In re Kaiser,* 722 F.2d at 1582–83. The transfer of property to a spouse is a "classic" badge of fraud. *Id.* at 1583 (citation omitted). When a questionable transfer occurs, and it is not in the usual course of business, courts consider it a badge of fraud that infers intent. *Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005). Asset shifting to different corporate entities wholly owned or "so closely assimilated" by the debtor is an additional badge of fraud. *See Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 218–19 (1941). Each of the badges of fraud listed above are present here.

At the outset, for all intents and purposes, the Debtor was Dr. Xiao, and Dr. Xiao was the Debtor.[17] Nearly all actions described herein were taken by the Debtor were done at the behest, direction, and design of Dr. Xiao and for his benefit.

After the $158,917.00 Transfer and the $1.43 Million Transfer, the Debtor only once had more than $180,000.00 in its bank account. On that lone occasion, HGG and LSI channeled money

---

[17] Under Connecticut law, where the corporation functionally has "no separate existence" from the principal, the principal is "the alter ego who controls and dominates the corporation's affairs." *Patel v. Flexo Converters U.S.A., Inc.*, 68 A.3d 1162, 1167 (Conn. 2013) (explaining the two tests—instrumentality and identity—to determine an entity's corporate structure).

to the Debtor, earmarked to pay Mrs. Little's $1.1 million partial settlement. In April 2013, having already received $2.9 million in legal fees, HGG withdrew as the Debtor's legal counsel because the Debtor had not and could no longer pay HGG for their representation in the Dow Action. As the Debtor indicated to the District Court in the Dow Action, as early as May 2013, it formulated a plan to file for bankruptcy protection as a last resort response.

Neither Dr. Xiao's nor Ms. Chen's defenses or protestations to the contrary are credible. Without pause or reservation, Dr. Xiao continued conducting business on the Debtor's behalf through other entities that he conveniently created. He unabashedly acknowledged that these entities were formed purposefully to keep the Debtor's assets out of Mrs. Little's and Dow's hands. Dr. Xiao used his affiliates' foreign bank accounts, his own personal bank account with Ms. Chen, and HGG's trust account to conceal the Debtor's assets from these two creditors in particular. Dr. Xiao had one paramount goal: to leave the Debtor judgment-proof and channel its assets to his wife and family. His facility to channel, transfer, and distribute those monies reveals his conscious intention and design. Ms. Chen, knowing of the ongoing and increasing avalanche of legal proceedings, facilitated, collaborated, and aided and abetted these transfers, including the two Transfers at issue.

Based on the record, it is abundantly clear that the Debtor, through Dr. Xiao's and Ms. Chen's efforts, made the Transfers to hinder, delay, and defraud the Debtor's creditors, including Mrs. Little, Dow, and HGG, within two years of the Debtor's bankruptcy petition filing.

### a. The Divorce

When a disputed transfer results from a divorce settlement, the courts have considered specific badges of fraud relevant to assess allegations of a "sham" divorce, including:

> the quickly agreed upon split of property, the completion of the divorce proceeding on a "fast-track," the fact that one of the spouses was not represented by counsel in

the divorce proceeding, the existence of a short interval between the entry of the divorce decree and the bankruptcy filing, the fact that spouses continue to live together after the divorce in the very house that was transferred to one of the spouses, the fact that the transferor spouse continues to pay the mortgage, taxes, and other costs on the transferred house, the inequitable distribution of debts and assets in the divorce, and the fact that the couple holds themselves out in the public as still being married.

*United States v. Schaudt (In re Schaudt)*, 2012 WL 909299, at *13 (Bankr. N.D. Ill. Mar. 16, 2012) (citations omitted), *aff'd*, 2013 WL 951138 (N.D. Ill. Mar. 11, 2013). "Where a transfer of property is made to a spouse by means of a 'fast-track' divorce on the eve of bankruptcy, this is often evidence of a fraudulent scheme to keep property from creditors." *Dobin v. Hill (In re Hill)*, 342 B.R. 183, 196 (Bankr. D.N.J. 2006) (citation omitted).

The Debtor's history under the leadership of Dr. Xiao and Ms. Chen is rife with suspect transfers, but none more so than in the months leading up to the Debtor's Chapter 7 bankruptcy petition filing. Ms. Chen filed the Divorce Action the day after the District Court ordered a hearing on Dow's Motion for Default Judgment seeking $15.7 million in damages against the Debtor and Dr. Xiao. Multiple copies of the Dow Action documents were mailed to Ms. Chen's Marital Home during this time. Although Ms. Chen chooses to feign ignorance over the happenings in the Dow Action during this Adversary Proceeding, the evidence abounds that she was on actual notice of the litigation in the Dow Action and the adverse course it took against both the Debtor and her husband, Dr. Xiao. While mail affecting the Debtor's continued existence piled up, Ms. Chen, at best, can only be described as remaining willfully blind to a multimillion-dollar action affecting a business of which she was 10% owner, and from which she had received over $1 million. To pretend she had no idea of the severity of the litigation makes a mockery of her duties as a member of the Debtor and common sense. Her contentions to the contrary cast further doubt on her credibility. In actuality, Ms. Chen knew all along the consequences of the Debtor's actions, be it

through the formal notice sent by Dow and the District Court, or through conversations with her husband.

The Divorce Judgment entered a mere three weeks after Ms. Chen's divorce filing without the benefit of formal discovery, asset valuation, or earnest negotiations. A mere 20 days after the Divorce Judgment, the Debtor filed for Chapter 7 bankruptcy protection. The distribution of marital assets via the PSA was extremely inequitable on its face, as the parties caused the transfer of nearly all of their significant, liquid assets to Ms. Chen. No due weight or apparent disclosure of Dr. Xiao's potentially multimillion-dollar liabilities to third parties or the effect of the Debtor's impending bankruptcy on Dr. Xiao's earning potential appeared in the divorce record. Ms. Chen herself acknowledged during this Adversary Proceeding that her husband made only $275.00 in the year before the Divorce Action, rather than the $180,000.00 figure indicated in the PSA. Further, after the Divorce Action, Dr. Xiao continued to live with Ms. Chen at the Marital Home, in the very house transferred to her pursuant to the PSA.

Upon the Court's examination of the record relating to the Divorce Action, the Chapter 7 Trustee has manifestly met his burden of proof by showing that the Debtor actually intended to hinder, delay, or defraud its creditors when it made the Transfers to Ms. Chen within two years of the Petition Date, and that the Transfers were actually fraudulent within the meaning of 11 U.S.C. § 548(a)(1)(A).

C. Count IV: Constructive Fraudulent Transfers Under 11 U.S.C. § 548

Count IV seeks to avoid the Transfers because the insolvent Debtor received less than reasonably equivalent value for the Transfers from Ms. Chen. Under the constructive fraudulent transfer statute, the following elements must be met:

> The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property,

or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

> . . .
> (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii)
>> (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).[18] Under this avoidance statute, "the bankruptcy trustee is permitted to avoid any transfers within [two] year[s] of the filing date . . . for which the debtor did not receive reasonably equivalent value, and at which time the debtor was insolvent or because of which the debtor became insolvent." *Carroll v. Tese-Milner (In re Red Dot Scenic, Inc.)*, 351 F.3d 57, 58 (2d Cir. 2003) (citation omitted). The trustee must prove the elements of a constructive fraudulent transfer claim by a preponderance of the evidence. *Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.)*, 435 B.R. 866, 875 (Bankr. S.D.N.Y. 2010). To decide whether funds were exchanged for a reasonably equivalent value, the court is required to determine the value of what was transferred compared to the value of what was received. *Coan v. Fleet Credit Card Servs., Inc. (In re Guerrera)*, 225 B.R. 32, 36 (Bankr. D. Conn. 1998). There need not be dollar-for-dollar exchange, but "the court must keep the equitable purposes of the statute firmly in mind,

---

[18] *See Geltzer v. Xaverian High Sch. (In re Akanmu)*, 502 B.R. 124, 130 (Bankr. E.D.N.Y. 2013) ("The purpose of [11 U.S.C. § 548(a)(1)(B)] is to set aside transactions that 'unfairly or improperly deplete a debtor's assets' so that the assets may be made available to creditors.") (citations omitted).

recognizing that any significant disparity between the value received and the obligation assumed by either issuer will have significantly harmed the innocent creditors[.]" *Rubin v. Mfrs. Hanover Tr. Co.*, 661 F.2d 979, 994 (2d Cir. 1981).

Ms. Chen has classified both the $1.43 Million Transfer and the $158,917.00 Transfer as dividends payable to her from the Debtor. At the same time, she and Dr. Xiao have also classified such as income from the Debtor to the two of them, with Dr. Xiao receiving the $1.43 Million Transfer as income. On all of her joint tax returns, Ms. Chen never once accounts for the income she claims to have derived from the Debtor. Every year she only lists her $100,000.00 salary from Novartis as her income.

Defining the $1.43 Million Transfer as either a dividend or other income does not help Ms. Chen. Both characterizations fail the constructively fraudulent transfer test. Although undefined by the Bankruptcy Code, the Internal Revenue Code defines a dividend as "any distribution of property made by a corporation to its shareholders . . . out of its earnings and profits of the taxable year . . . without regard to the amount of the earnings and profits at the time the distribution was made." 26 U.S.C. § 316(a)(2).

As to the assertion that these monies constituted wages or consulting income, there is no credible proof from either the Debtor or Ms. Chen that the Transfers were for any substantive services to the Debtor. The $1.43 Million Transfer cannot be seriously described as consideration for Ms. Chen's unproductive administrative services to the Debtor. Assuming, *arguendo*, that the Debtor made the $1.43 Million Transfer as a payment for Ms. Chen's services, the money grossly overcompensates her for her "work" and would have been multitudes more than even the principal and 90% member received from the Debtor that year. In 2007, Ms. Chen received $212,000.00 for her alleged services, and in 2008, she received $350,000.00 for her alleged services. She then

performed mostly administrative work for the Debtor, such as answering phones, filing, and retrieving the mail delivered to the mailbox of her Marital Home. Though it is unclear precisely how long she performed those services, Ms. Chen was much more actively involved with the Debtor in the years preceding 2011, when both the $158,917.00 Transfer and $1.43 Million Transfer took place. Regardless, she has failed to adduce any substantive and credible proof of a defense that her services provided tangible reasonably equivalent value to the Debtor.

Notwithstanding Ms. Chen's adamant assertions that she was winding down her assistance with the Debtor in 2011, she still received the $158,917.00 Transfer and $1.43 Million Transfer. By that time, she had explicitly told Dr. Xiao that she no longer wanted to work for the Debtor and had made an affirmative decision that she would not become more involved with the Debtor. Her own testimony belies the astounding amount of money she received especially given that she admits that she had no idea whether her uncle helped the Debtor's business, and she was unable to provide any detail or substance about the precise work she performed for the Debtor. Although she allegedly performed "some" human resource work after a headhunter provided her resumes, these services are not reasonably equivalent to the collective $1,589,171.00 Transfers, especially for a company with the Debtor's diminished financial means. At best, her work during this timeframe can be described as ministerial, and seems to more align with moral or spousal support. Nothing in the record justifies why she would receive over $1 million more in 2011 than in years past, especially while the Debtor and its business rapidly deteriorated and she undertook less work. Leading up to and during 2011, the Debtor did not receive from Ms. Chen any material services or goods, in good faith and for value, equivalent to the $1.43 Million Transfer or $1,589,171.00 in total transferred. This Court is unpersuaded by Ms. Chen's lone defense of good faith[19] based on

---

[19] This alleged defense is legally insufficient under 11 U.S.C. § 548(c), which requires that the transfer by the bankruptcy estate be given for value *and* that the transferee took it in good faith.

the factual record and her lack of credibility. Her prepetition conduct, defensive trial testimony, and evasive responsiveness support a finding to the contrary.

i.    *LXEng's Insolvency*

Insolvency is one of the elements of a constructive fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B)(i)(I). In what has been dubbed the "balance sheet" test, insolvency exists within an entity when its financial condition is "such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of— (1) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and (2) property that may be exempted" from the bankruptcy estate under 11 U.S.C. § 522. 11 U.S.C. § 101(32)(A). In defining insolvency, Connecticut's definition mirrors the Bankruptcy Code's. Conn. Gen. Stat. § 52-552c(a). Connecticut law also presumes insolvency where the debtor fails to make debt payments by their due dates. *Id.* § 52-552c(b). Insolvency is a question of fact, but the requirements of 11 U.S.C. § 548 can be satisfied "provided the court finds it was insolvent proximately before or immediately after the time of [the] transfer." *Join-In Int'l (U.S.A.) Ltd. v. N.Y. Wholesale Distribs. Corp. (In re Join-In Int'l (U.S.A.) Ltd.)*, 56 B.R. 555, 560 (Bankr. S.D.N.Y. 1986) (citation and internal quotation marks omitted).

Debt is defined as "liability on a claim." 11 U.S.C. § 101(12). Claim, as defined by the Bankruptcy Code, is a right to payment, even if it is contingent, disputed, or not reduced to judgment. 11 U.S.C. § 101(5)(A). Since claims may be disputed or contingent, they must be included when calculating total indebtedness for purposes of determining insolvency. *See Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 313 (Bankr. S.D.N.Y. 2013); 2 RICHARD LEVIN & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 101.32[5], p. 101-155 (16th ed. 2019). Claims are contingent when there is "uncertainty surrounding the likelihood of the

triggering event occurring, thus activating the debtor's obligation to pay the creditor[.]" C. Ryan Stewart, *Contingent Liabilities and Disputed Claims in the Context of a Bankruptcy Solvency Analysis*, INSIGHTS, 51, 52 (Winter 2014).

The Bankruptcy Code, Bankruptcy Rules, and case law do not prescribe a uniform or statutory way to calculate contingent claims in bankruptcy proceedings. Alisa H. Aczel, *The Solvency of Mass Tort Defendants: A "Reasonable" Approach to Valuing Future Claims*, 20 Emory Bankr. Dev. J. 531, 539 (2004); Kathryn Ogden Balmforth, *Estimating Contingent Liabilities to Determine Insolvency in Bankruptcy Proceedings:* In re Xonics Photochemical, Inc., 1989 BYU L. Rev. 1315, 1318 (1989). Contingent claims may be discounted based on the probability that the contingency will never occur. *Davis v. Suderov (In re Davis)*, 169 B.R. 285, 302 (E.D.N.Y. 1994); *In re Tronox Inc.*, 503 B.R. at 313. To calculate a disputed claim's value properly, the court must assess the likelihood of the claim's success. *Licata v. Coan*, 2015 WL 9699304, at *7 (D. Conn. Sept. 22, 2015), *aff'd sub nom. In re Licata*, 659 F. App'x 704 (2d Cir. 2016).

The unrebutted record supports the conclusion that the Debtor was insolvent both before and after the Transfers. Leading up to the Petition Date, the $1.43 Million Transfer funds were held in the TD Account, which was in the name of the only two members of the Debtor. After the bankruptcy filing, the Debtor failed to disclose the Transfers in its SOFA or at the first meeting of its creditors. As the Debtor agreed to make a $1.5 million settlement payment to Mrs. Little to resolve the Little Action, with $300,000.00 due and owing, the Debtor's Schedule F includes the $300,000.00 figure as an unsecured claim. The Debtor's Schedule F also indicated it owed HGG $666,000.00 on the Petition Date. However, the Debtor failed to prescribe any numerical value to its liabilities from the Dow Action in its Chapter 7 bankruptcy petition schedules, even though

Dow filed an uncontested $15.7 million claim in the Debtor's case. Absent an objection, that claim is presumptively valid.[20]  Fed. R. Bankr. P. 3001(f). Although the Dow claim may have been disputed, contingent, and unliquidated, it still must appear in the balance sheet analysis when calculating the Debtor's insolvency, with the claim's proper valuation remaining the sole issue. *See In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988); *Estimating Contingent Liabilities*, 1989 BYU L. Rev. at 1323.

The Court finds it is significantly more likely than not that the Debtor would have been held liable in some way to Dow either through default, judgment,[21] or settlement. Where "a contingent liability is both probable and capable of reasonable estimation, it must be accrued[.]" *Estimating Contingent Liabilities*, 1989 BYU L. Rev. at 1329 (citing ACCOUNTING FOR CONTINGENCIES, Statement of Financial Accounting Standards No. 5 § 8 (Fin. Accounting Standards Bd. 1986)). At the time of the bankruptcy filing, the District Court had disqualified the Debtor's key defensive expert witness with its *Daubert* order, striking a significant blow to the Debtor's defenses and its ability to rebut the damning conclusions of the District Court's independent expert. HGG withdrew from representing the Debtor in the Dow Action, and Attorney Medina had indicated to the District Court that the Debtor intended to file bankruptcy on the verge of a default judgment. The substantial likelihood of a credible defense in the Dow Action was never advanced at trial. The continued maintenance of the litigation itself was also an unsustainable expense to the Debtor, as Ms. Chen knew. The Debtor had already accumulated $666,000.00 in legal fees owed to HGG that it had failed to pay, plus the $2.9 million HGG had previously held in reserves for legal fees. While the Debtor may not have been found liable for the entire $15.7

---

[20] Importantly, where there is no objection to a proof of claim, it is deemed allowed in a bankruptcy case. 11 U.S.C. § 502(a).
[21] The District Court had already entered default judgment against the Debtor in 2014 and was holding in abeyance its decision on whether it would disgorge the $15.7 million Dow sought from the Debtor.

million sum, even by the most deferential standard, it is more likely than not that either through default, continued litigation, or settlement, the Debtor, like its codefendants in the Dow Action, would have sustained a substantial liability to Dow.

By the time of the Transfers, the Debtor's depreciable assets had no meaningful value and were sold for "scrap," leaving the Court to conclude these assets were valued at $0.00. At most, according to its 2011 tax return, these assets were possibly worth $365,000.00. The Debtor's contracts and revenues had long since dried up, and the Debtor was left a shell of a company. The multimillion dollar liabilities coupled with the zero value of the Debtor's appreciable assets irrefutably prove that the Debtor was insolvent by every reasonable analysis throughout 2011, the period when the Transfers occurred.

### ii. LXEng's Inadequate Capitalization

An alternative way for the Court to determine insolvency in assessing whether the Debtor engaged in a constructive fraudulent transfer is to determine whether the Debtor had unreasonably small capital at the time of the Transfers at issue, pursuant to 11 U.S.C. § 548(a)(1)(B)(ii)(II). When deciding such, the court must weigh the company's "raw financial data against both the nature of the enterprise itself and the extent of the enterprise's need for capital during the period in question." *Barrett v. Cont'l Ill. Nat. Bank & Tr. Co.*, 882 F.2d 1, 4 (1st Cir. 1989) (citation omitted). Courts can review factors like "the company's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue." *MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995) (citations omitted). Courts "examine not what ultimately happened to the company, but whether the company's then-existing cash flow projections (i.e., projected working capital) were reasonable and prudent when made" while undertaking this analysis. *Statutory Comm. of Unsecured Creditors*

43

*v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007) (citation omitted).

When the Debtor made the Transfers to Ms. Chen, the Debtor and Ms. Chen were both well aware of the lack of cash flow into the business. After all, at that point, the Debtor failed to enter into any new contract with a customer for over three years, and Ms. Chen had asked her uncle to help the Debtor find new Chinese clients. The Debtor failed to sign any new contracts, even if it performed work for new clients, and instead left LSI or another of Dr. Xiao's affiliates to sign them. There was no logical, viable, rational, or believable reason for the Debtor to conclude it would have additional revenue sources in 2011. Not only that, but Dr. Xiao and Ms. Chen also knew of the weight of obligations that the Debtor was liable for at the time of the Transfers. The Debtor was simultaneously defending itself against the Little Action and Dow Action. The attorney's fees alone were in the multimillion-dollar range, without material resources to support those representations.

The $1.43 Million Transfer to Ms. Chen, in particular, essentially left the Debtor with nothing to operate the business, litigate, or defend itself. The inconsequential $100,000.00–$200,000.00 that remained in the bank afterward was nowhere near enough to allow the Debtor to continue defending itself through its financial and legal distress. The Debtor's attorneys, HGG, realized that when they ultimately withdrew from the Dow Action for lack of payment of their fees in the three months leading up to the bankruptcy filing. Taken together, the Debtor left itself with unreasonably small capital to conduct any of its business.

The Debtor made the constructively fraudulent transfers while it was defending, in vain, against two sizable lawsuits, shifting roughly 80% of its assets to Ms. Chen and leaving the already dwindling company woefully insolvent, unable to pay its debts or defend itself in litigation. The

Chapter 7 Trustee has shown by a preponderance of the evidence that Ms. Chen received the Transfers in exchange for less than reasonably equivalent value, at a time when the Debtor's finances were in complete disarray to the point of insolvency, and, thus, supporting the Court's conclusion that the Transfers were constructively fraudulent.[22]

D.  Count V: Recovery Under 11 U.S.C. § 550(a) of the Transfers

In arguing for the avoidance of the Transfers, the Chapter 7 Trustee in Count V seeks recovery of the value of the Transfers from Ms. Chen, the initial transferee of the funds. The Bankruptcy Code codifies the ways in which a trustee may recover fraudulently conveyed property, including from the initial transferee. *See* 11 U.S.C. § 550(a). The Second Circuit uses the mere conduit test in determining who qualifies as an initial transferee under 11 U.S.C. § 550(a). *Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 58 (2d Cir. 1997). Acting as a mere conduit is not enough; instead, the transferee must have "dominion over the money or other asset, the right to put the money to one's own purposes." *Id.* at 57 (citation and internal quotation marks omitted). Initial transferees are subject to strict liability. *Id.*

Ms. Chen was anything but a mere conduit relative to the Transfers. The $158,917.00 Transfer was deposited into the TD Account which bore her name. The Debtor made the $1.43 Million Transfer as a cash advance in her name and sent it to the TD Account, which was also in her name. She had unrestricted access to the TD Account up to, during, and after the Transfers. After the PSA executed, she had exclusive control over these funds because Dr. Xiao relinquished any right to the funds in the TD Account in the Divorce Action. She had complete dominion over the $1.43 Million Transfer funds and could put it to any use she saw fit, which she subsequently

---

[22] The evidence is equally clear and convincing in that regard.

did when she transferred the money to other bank accounts and ultimately to her parents in China, all in an effort to frustrate all of the Debtor's creditors from collecting from her. Thus, because the Transfers are avoidable as outlined in Part V. Sections A–C., and because Ms. Chen received the funds as an initial transferee, the Chapter 7 Trustee is entitled to recover the value of the Transfers from Ms. Chen under 11 U.S.C. § 550(a).

### E.  Count VI: Imposition of a Constructive Trust

Based on his foregoing arguments, in Count VI of the Complaint, the Chapter 7 Trustee would like this Court to impose a constructive trust over the assets that the Debtor transferred to Ms. Chen. Bankruptcy courts are generally reluctant to impose constructive trusts without a substantial reason to do so. *Superintendent of Ins. for N.Y. v. Ochs (In re First Cent. Fin. Corp.)*, 377 F.3d 209, 217 (2d Cir. 2004) (citation and internal quotation marks omitted). To the extent that the Chapter 7 Trustee seeks a constructive trust over the Transfers, as Ms. Chen points out in her Post-Trial Reply Brief, the issue was not briefed or raised beyond the pleadings stage. Based on this decision, however, imposing a constructive trust is unnecessary because the Chapter 7 Trustee prevails on other counts for damages and has successfully pursued other remedies.

## VI.    CONCLUSIONS

The Court hereby **ADJUDGES, DECREES, AND DECLARES** that:

1) As to Counts I and II, the Chapter 7 Trustee has met his burden of proof by clear and convincing evidence to warrant the relief requested under 11 U.S.C. § 544 and Conn. Gen. Stat. § 52-552a, *et seq.*

2) As to Counts III and IV, as they pertain to actual fraudulent transfers, the Chapter 7 Trustee has met his burden of proof by a preponderance of the evidence to warrant the relief requested under 11 U.S.C. § 548(a)(1)(A). The Debtor transferred substantial

amounts of money to Ms. Chen in an attempt to avoid its creditors, committing actual fraudulent transfers avoidable under 11 U.S.C. § 548(a)(1)(A).

3) As to Counts III and IV, as they pertain to constructive fraudulent transfers, the Chapter 7 Trustee has met his burden of proof by a preponderance of the evidence to warrant the relief requested under 11 U.S.C. § 548(a)(1)(B). The Debtor transferred substantial amounts of money to Ms. Chen in an intentional scheme to avoid the Debtor's creditors and committed constructively fraudulent transfers avoidable under 11 U.S.C. § 548(a)(1)(B).

4) Ms. Chen's asserted affirmative good faith defense, ostensibly pursuant to 11 U.S.C. § 548(c), is legally unsound and unavailing as a matter of law and proof, as explained herein.

5) As to Count V, the Chapter 7 Trustee has established that Ms. Chen was not a mere conduit, but that she had full dominion and control over the $158,917.00 Transfer and the $1.43 Million Transfer and was able to put the money to her uses, warranting the relief requested under 11 U.S.C. § 550(a). Ms. Chen is liable to the Chapter 7 Trustee for the Transfers, avoidable under 11 U.S.C. § 548, and the Chapter 7 Trustee may recover the value of the Transfers from her as damages pursuant to 11 U.S.C. § 550(a).

6) As to Count VI, the Chapter 7 Trustee has not met his burden to impose a constructive trust over the Transfers.

7) Judgment shall enter in favor of the Chapter 7 Trustee and against Ms. Chen on Counts I, II, III, IV, and V in the amount of $1,589,171.00, plus interest, fees, and costs as may be allowed by law.

8) In the interests of fairness, equity, and justice, the Court waives the 14-day stay of this Decision imposed by Fed. R. Bankr. P. 7062. Delays in execution on this judgment only further a fraud upon this Court and the Debtor's Chapter 7 bankruptcy estate through the prospect of asset dissipation.

This Decision constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed. R. Bankr. P. 7052. In this Adversary Proceeding, a separate judgment shall enter simultaneously with the docketing of this Decision. The Clerk is ordered to schedule a status conference within 15 days hereof with mandatory attendance by the parties and their respective legal counsel.

**IT IS SO ORDERED** at Hartford, Connecticut on this 30th day of August 2019.

*James J. Tancredi*
*United States Bankruptcy Judge*
*District of Connecticut*